UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

                                       Case No. 14-41789-nhl

Sanjay Kedia,

                                       Chapter 7

                        Debtor.
-------------------------------------------------------------x
Suparo International Inc.,

                        Plaintiff.                Adv. Pro. No. 14-01090-nhl

             v.

Sanjay Kedia,

                        Defendant.
-------------------------------------------------------------x

## DECISION AFTER TRIAL

APPEARANCES:

Niall D. O'Murchadha           Joel Alan Gaffney, Esq.
Schlam Stone & Dolan LLP      Gaffney Law, P.C.
26 Broadway, 19th Floor        6565 America's Parkway #200
New York, NY 10004            Albuquerque, NM 87110
*Attorneys for the Plaintiff*       *Attorneys for the Defendant*

HONORABLE NANCY HERSHEY LORD
UNITED STATES BANKRUPTCY JUDGE

## INTRODUCTION

Before this Court is an adversary proceeding commenced by plaintiff Suparo International Inc. ("Suparo" or "Plaintiff"), seeking a determination that the debt owed by Sanjay Kedia, the debtor and defendant herein, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A)[1] and (a)(6).[2]

The Court held a trial on the matter. As set forth below, the Court finds that Suparo established by a preponderance of the evidence that the Debtor obtained the debt by "actual fraud" <u>and</u> by "false pretenses" pursuant to § 523(a)(2)(A). Because the debt is not dischargeable under § 523(a)(2)(A), the Court need not consider arguments pertaining to § 523(a)(6).

## JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(1), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following are the Court's findings of fact and conclusions of law to the extent required by Rule 52 of the Federal Rules of Civil Procedure, as made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

---

[1] 11 U.S.C. §§ 101 *et seq.* may be referred to throughout as the "Code." References to "§ _____" are to sections in the Code unless otherwise specified.

[2] The Complaint alleges three causes of action under § 523(a)(2), (a)(4), and (a)(6), respectively. Although the Complaint does not explicitly state whether the Plaintiff is seeking an exception from discharge pursuant § 523(a)(2)(A), (a)(2)(B), or both, the Complaint only includes the language appearing in § 523(a)(2)(A) beneath the heading titled, "First Cause of Action – Non-Dischargeability Of Kedia's Debt Under Section 523(a)(2) of the Bankruptcy Code." Compl. ¶¶ 34–35. Additionally, the Plaintiff neither raises arguments based on § 523(a)(2)(B) at trial nor in its Post-Trial Memorandum. *See* Trial Tr. vols. 1, 2, and 3; Pl.'s Post-Trial Mem. Accordingly, the Court will consider the Plaintiff's § 523(a)(2) claim exclusively under § 523(a)(2)(A). Furthermore, the Plaintiff abandoned its § 523(a)(4) claim at trial. Trial Tr. vol. 3 30:6–9.

## FACTS

The facts of this case were developed at trial through the testimony of Vineet Nagpal and Sanjay Kedia, and certain exhibits admitted into evidence. Following trial, the parties submitted post-trial memoranda.

### *The Parties and Related Companies*

Suparo is a New York corporation with its principal office in Nassau County that "provide[s] consulting, logistics for shipping and customs, and financing . . . ." Pl.'s Ex. 2; Joint Pretrial Mem. 5. Vineet Nagpal "handle[s] the day to day affairs" of Suparo. Trial Tr. vol. 1, 15:6.

At all times relevant to this litigation, the Debtor was the sixty-five percent owner and principal of Lavie Clothing Co., Inc. ("Lavie"), a garment company that imported clothing from overseas sources to the United States. Joint Pretrial Mem. 5; Trial Tr. vol. 1, 16:22–25; Pl.'s Ex. 2, § 5(c). Atul Goyal ("Atul") was a "key person involved with Lavie [who] handl[ed] the day to day affairs . . . ." Trial Tr. vol. 1, 15:15–25, 16:1. The Debtor was also the sole owner and shareholder of Belsun Corp. ("Belsun"), an exporter of paper and paper scrap to India from the United States. Joint Pretrial Mem. 6; Trial Tr. vol. 1, 66:1–6. The Debtor personally handled Belsun's finances. Trial Tr. vol. 1, 100:4–5. Atul was neither employed by nor associated with Belsun. Trial Tr. vol. 1, 101:9–25, 102:1–4.

The Debtor either owned or partially owned three additional companies, Brookside Paper Inc. ("Brookside"),[3] Digital Systems Inc. ("Digital Systems") and SAI Fashion Inc. ("SAI"). Pl.'s Ex. 13; Trial Tr. vol. 1, 123:19–25, 124:1–25. The Debtor was the President and fifty-

---

[3] While the Debtor's ownership of Brookside Paper Inc. was not initially disclosed, the Debtor amended his schedules to include it approximately one-month after commencing his bankruptcy case. Trial Tr. vol. 2, 3:10–25, 4:1–21.

percent owner of Digital Systems, a software company founded in early 2012. Trial Tr. vol. 1, 126:18–25, 127:1–10. According to the Debtor, Digital Systems had "no business, no transactions." Trial. Tr. vol. 1, 127:7–10. The Debtor was also the President and fifty-percent owner of SAI. Trial Tr. vol. 1, 124:7–8, 20–24. Finally, at the time of the filing of his bankruptcy petition, the Debtor was the President and one-hundred percent owner of Brookside, another paper company, where he worked five days per week. Trial Tr. vol. 1, 127:17–25, 128:1–9, 129:3–4. Until near the end of 2012, Brookside and Belsun operated out of the same office. Trial Tr. vol. 1, 129:20–25, 130:1–10.

### The Pre-Agreement Business Relationship

In early 2012, the Debtor and Atul approached Nagpal and proposed that Suparo provide financing to Lavie. Trial Tr. vol. 1, 16:4–5, 63:14–17. The Debtor and Nagpal proceeded to have "several meetings." Trial Tr. vol. 1, 20:1–5. When asked about Lavie's financial condition, the Debtor told Nagpal that "the base of the company was good—admin was good, and [Lavie] w[as] having some cash flow problems and [] needed somebody to help with the financing of the company." Trial. Tr. vol. 1, 64:25, 65:1–3, 16–20. As a result of their meetings, Suparo loaned Lavie $60,000 in January or February of 2012. Trial. Tr. vol. 1, 58:1–15. This loan had a one- or two-month term and was repaid with interest in a series of post-dated checks issued altogether by Lavie. Trial Tr. vol. 1, 59:1–23. Each check was deposited by Suparo on the date reflected on said check and cleared Lavie's bank account. Trial Tr. vol. 1, 59:18–23.

### The Agreement

Some months later, Suparo and Lavie entered into an agreement, dated as of May 1, 2012 (the "Agreement"), that Lavie, Belsun, and the Debtor each signed before a notary on August 10, 2012. Joint Pretrial Mem. 5; Pl.'s Ex. 2; Trial Tr. vol. 1, 41:18–25:42:4–5, 54:12–14.  The

Debtor and Nagpal negotiated the terms of the Agreement, which was signed by Nagpal on behalf of Lavie, and by the Debtor on behalf of himself, Lavie, and Belsun. Joint Pretrial Mem. 6; Trial Tr. vol. 1, 67:23–24. The Agreement provided for up to $250,000 in financing for Lavie and was personally guaranteed by the Debtor and Belsun. Trial. Tr. vol. 1, 64:22–24, 66:11–20; Pl.'s Ex. 2. The personal guarantee reads, in pertinent part, as follows:

> In order to induce Suparo to enter in to [*sic*] this Agreement, [the Debtor] and Belsun, jointly and severally, hereby personally, irrevocably and unconditionally, <u>guarantee the punctual and full payment</u> to Suparo of all payments due to Suparo, and the performance of all of Lavie's obligations, under this Agreement. This is a guarantee of payment and not of collection, and no attempt need be made to collect from Lavie prior to enforcing this guarantee. . . .

(the "Personal Guarantee"). Pl.'s Ex. 2, § 5(b) (emphasis in original). Additionally, the Agreement granted "Suparo a security interest in all of Lavie's assets"; provided a pledge "to Suparo [of] fifty (50%) percent of the stock of Lavie" upon Suparo's request; and allowed for the recovery of "reasonable attorneys' fees, costs, and disbursements" to the prevailing party "[i]n the event of litigation . . . ." Pl.'s Ex. 2, §§ 5, 6(b). According to the Agreement, the general business arrangement between Lavie and Suparo was as follows: Lavie would arrange for its vendors to manufacture specific products and then would send a corresponding purchase order to Suparo. Pl.'s Ex. 2, § 2. Thereafter, Suparo would pay the vendors for the products and have them shipped to Lavie's warehouses located in the United States. Pl.'s Ex. 2, § 2. Suparo was to tender 25% to the vendors upon submission of the purchase order and the remaining 75% when the products were ready for shipment, unless agreed otherwise. Pl.'s Ex. 2, § 2. Upon receipt of the products, Suparo was to invoice Lavie for an amount calculated as "the FOB price charged by the vendor . . . plus the cost of the shipping, duties, customs, insurance and other incidentals" as well as "a service fee of 12%." Pl.'s Ex. 2, § 2.

### *Performance Under the Agreement, the HSBC Checks, and the October 3rd E-mail*

Between approximately May and September of 2012, Suparo performed under the Agreement and submitted timely invoices to Lavie. Joint Pretrial Mem. 6. The same cannot be said of Lavie, which was unable to make payments due Suparo in accordance with the terms of the Agreement. *See* Joint Pretrial Mem. 6. While Suparo did receive some minor payments, there remained a large outstanding balance. *See* Joint Pretrial Mem. 6. As a result, Suparo agreed to accept a series of post-dated checks drawn from Lavie's HSBC bank account (the "HSBC Account"), totaling $154,653.54 (the "HSBC Checks"). Joint Pretrial Mem. 6; Trial Tr. vol. 1, 20:19–20, 21:8–15, 22:20–25, 35:4–7; Pl.'s Ex. 3. The Debtor himself signed the HSBC Checks. Joint Pretrial Mem. 6; Pl.'s Ex. 3. The HSBC Checks were given to Suparo a few weeks prior to June 19, 2012, were in varying amounts, and bore dates ranging from June 19, 2012 to August 14, 2012. Trial Tr. vol. 1, 69:4–7, 73:13–16; Pl.'s Ex. 3. At the onset, the Debtor informed Suparo that each HSBC Check would clear only if presented for payment on the future date reflected on the check. Joint Pretrial Mem. 6; Trial Tr. vol. 1, 21:18–21. After receipt of the HSBC Checks, Suparo advanced additional financing to Lavie in the amount of at least $39,612.50. Joint Pretrial Mem. 6.

Between June and August of 2012, Suparo was advised not to deposit many of the checks. Trial Tr. vol. 1, 81:13–16, 84:14–25, 85:1–2, 87:11–16; Pl.'s Ex. 24. On numerous occasions, the Debtor asked Suparo to delay depositing checks on the deposit date. Trial Tr. vol. 1, 56:13–20; Pl.'s Ex. 24. In June of 2012, Suparo was only able to deposit "a couple of checks." Trial Tr. vol. 1, 81:13–16. In July 2012, the Debtor allowed Suparo to deposit $15,000.00 worth of checks. Trial Tr. vol. 1, 84:14–25, 85:1–2; Pl.'s Ex. 24. Suparo, at the Debtor's behest, deposited no checks in August of 2012, but was able to deposit two checks totaling $6,000.00 in

September of 2012. Trial Tr. vol. 1, 85:6–15; 87:11–16; Pl.'s Ex. 24. When Suparo deposited the remainder of the HSBC Checks on September 26, 2012, they all bounced. Trial Tr. vol. 1, 22:9, 23:9.

After the HSBC Checks bounced, Nagpal, Atul, and the Debtor "had a series of conversations." Trial Tr. vol. 1, 23:12–16. On October 7, 2012, they met at the Debtor's office and Atul signed and wrote "We owe you this money, OK" on a printed-out e-mail, dated October 3, 2012 (the "October 3rd E-mail"), detailing the amounts Lavie owed Suparo as of that date. Pl.'s Ex. 1, Ex. 2; Trial Tr. vol. 1, 23:24–25, 24:1–14. The Debtor "agreed and authorized" Atul to "make that writing." Trial Tr. vol. 1, 24:9–10, 71:19–25, 72:1–10. According to the October 3rd E-mail, Lavie owed Suparo $195,353.54 for three completed shipments, but had only paid $40,700.00, leaving a total of $154,653.54 outstanding, which equaled the sum of the bounced HSBC Checks. Joint Pretrial Mem. 6. The October 3rd E-mail also confirmed that Suparo had advanced payments to Lavie's vendors in connection with other purchase orders pertaining to uncompleted transactions in the amount of $39,612.50, which, after adding Suparo's commission, meant that the Debtor owed Suparo an additional $44,366.00. Joint Pretrial Mem. 6. Thus, as of the October 3rd E-mail, Lavie and the Debtor owed Suparo a total of $199,019.54. Pl.'s Ex. 1, Ex.2.

### The Wells Fargo Checks and the May 20th E-mail

In either November or December of 2012, the Debtor provided Nagpal with another series of signed, post-dated checks drawn from Lavie's Wells Fargo bank account (the "Wells Fargo Account"), and payable to Suparo, totaling $184,019.04 (the "Wells Fargo Checks"). Joint Pretrial Mem. 6–7; Trial Tr. vol. 1, 23:16–17, 25:24–25, 26:1–13, 54:18–25, 75:2–4; Pl.'s Ex. 4. Similar to the HSBC Checks, the Wells Fargo Checks were in varying amounts and bore dates

ranging from January 10, 2013 to March 20, 2013. Pl.'s Ex. 4; Trial Tr. vol. 1, 26:19–21. The

Debtor instructed Nagpal not to deposit each check until the date appearing on the check,

"otherwise they would bounce." Joint Pretrial Mem. 6; Trial Tr. vol. 1, 44:19–24, 79:21–23. As

the intended deposit date on each of the Wells Fargo Checks approached, the Debtor informed

Nagpal that the checks would not be honored if deposited and asked Suparo to delay deposit.

Joint Pretrial Mem. 6. Ultimately, Lavie advised Suparo that it could deposit only one of the

Wells Fargo Checks in the amount of $7,500.00, which left Suparo in possession of $176,519.54

in uncashed Wells Fargo Checks. Joint Pretrial Mem. 7.

On May 20, 2013, the Debtor sent Suparo an e-mail titled "Letter for Vineet" (the "May

20th E-mail"), stating that Lavie's operations had been "suspended." Joint Pretrial Mem. 7; Pl.'s

Ex. 1, Ex. 3. It further confirmed the existence of a "receivable due from Lavie Clothing

Company to Suparo International amounting to $176,519.54. . . ." and reaffirmed the Debtor's

personal guarantee by "restat[ing] that this guarantee is in good standing and continuing until

such time that the loan is paid off." Pl.'s Ex. 1, Ex. 3.

### *The State Court Lawsuit*

On May 31, 2013, Suparo commenced a lawsuit against Lavie, Belsun, and the Debtor in

Nassau County Supreme Court (the "State Court Lawsuit"). Joint Pretrial Mem. 7; Pl.'s Ex. 1;

Trial Tr. vol. 1, 29:14–25, 30:1. Neither Lavie, Belsun, nor the Debtor contested the lawsuit, and,

on November 26, 2013, a default judgment was entered against each of them in favor of Suparo

(the "Default Judgment"). Joint Pretrial Mem. 7; Pl.'s Ex. 5. The Default Judgment required

Lavie and the Debtor to "turn over 50% of [Lavie's] stock to Suparo" and "perfect a security

interest in all of [Lavie's] assets in favor of Suparo" within ten days of entry thereof. Joint

Pretrial Mem. 7; Pl.'s Ex. 5. The Debtor admits that he was served with the Default Judgment

and that he had knowledge that the Default Judgment was entered against Lavie, Belsun, and him
personally, but he made no attempt to pay it. Trial Tr. vol. 1, 109:25, 110:1–12. Suparo has never
received any money based on the Default Judgment. Trial Tr. vol. 1, 32:1.

On December 5, 2013, Suparo caused information subpoenas & restraining notices to be
served on the Debtor, Lavie, and Belsun, none of whom responded or otherwise complied. Joint
Pretrial Mem. 7; Pl.'s Exs. 6–8. On April 14, 2014, the Debtor commenced the instant chapter 7
bankruptcy case. Joint Pretrial Mem. 7. As a result of their failure to comply with the restraining
notices and respond to the information subpoenas, the Nassau County Supreme Court held Lavie
and Belsun in contempt on May 5, 2014. Joint Pretrial Mem. 7. On June 13, 2014, the Debtor
appeared at a deposition ordered in the State Court Lawsuit for Lavie and Belsun (the "June 13th
Deposition"), at which he testified that he was the only person at either company who would
have been capable of answering Suparo's information subpoenas. Joint Pretrial Mem. 7.

## DISCUSSION

A primary "objective of the bankruptcy law is to afford a deserving debtor an economic
rehabilitation or 'fresh start' in life." *In re Bodenstein*, 168 B.R. 23, 27 (Bankr. E.D.N.Y. 1994).
This objective is, however, "tempered by an equally important objective and that is to prevent
the 'dishonest debtor's attempt to use the law's protection to shield his or her wrongdoing.'" *Id.*
(quoting *In re Newmark*, 20 B.R. 842, 852 (Bankr. E.D.N.Y. 1982)). Accordingly, barring a
successful objection to discharge by a trustee or creditor, a chapter 7 debtor will receive a
general discharge pursuant to § 727(a). 11 U.S.C. § 727(a).

Certain debts, however, may be excepted from a debtor's general discharge upon a proper
showing. 11 U.S.C. § 523(a). Section 523(a) provides a creditor with an "avenue for excluding a
specific debt from the debtor's general discharge if the creditor can establish certain requisite

8

elements." *In re Chadha*, 598 B.R. 710, 717 (Bankr. E.D.N.Y. 2019); 11 U.S.C. § 523(a).

"[C]ourts adhere to certain guiding principles" when assessing dischargeability under § 523(a).

*In re Bodenstein*, 168 B.R. at 27. One "widely recognized [principle] is that exceptions under 11

U.S.C. § 523(a) should be literally and strictly construed against the creditor and liberally in

favor of the debtor." *Id.* Accordingly, "[t]he burden of proving that a debt comes within one of

the statutory exceptions to dischargeability is upon the party opposing discharge of the debt." *Id.*

at 28 (citations omitted). A party proceeding under § 523(a) "bears the burden of proving the[]

elements by a preponderance of the evidence." *Sarasota CCM, Inc. v. Kuncman*, 466 B.R. 590,

595–96 (E.D.N.Y. 2012) (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

## NON-DISCHARGEABILITY UNDER § 523(a)(2)(A)

Section 523(a)(2)(A) provides, in pertinent part,

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(2) for money, property services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A). The terms "false pretenses," "false representation," and "actual fraud"

"embody somewhat differing concepts" within the context of § 523(a)(2)(A). *In re Dobrayel*,

287 B.R. 3, 12 (Bankr. S.D.N.Y. 2002). Courts have "historically construed the terms in

§ 523(a)(2)(A) to contain the 'elements that the common law has defined them to include.'"

*Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586 (2016) (quoting *Field v. Mans*, 516 U.S. 59,

69 (1995)).

***Actual Fraud***

For the reasons set forth below, the Court is convinced that the Debtor engaged in a fraudulent transfer scheme, which is sufficient to except the debt owed Suparo from the Debtor's discharge as "actual fraud" pursuant to § 523(a)(2)(A).

A debt for money or property obtained by "actual fraud" is non-dischargeable pursuant to § 523(a)(2)(A). 11 U.S.C. § 523(a)(2)(A). Generally, a creditor seeking to except from a debtor's discharge a debt obtained by "actual fraud" must prove the "five fingers of fraud," which are: "(1) a misrepresentation, (2) fraudulent intent, or scienter, (3) intent to induce reliance, (4) justifiable reliance, and (5) damage." *In re Chase*, 372 B.R. 125, 130 (Bankr. S.D.N.Y. 2007) (quoting *In re Dobrayel*, 287 B.R. at 12); *see In re Janac*, 407 B.R. 540, 546–47 (Bankr. S.D.N.Y. 2009).

In *Husky International Electronics, Inc. v. Ritz*, however, the Supreme Court broadened the scope of "actual fraud" within § 523(a)(2)(A) to include "forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation" and reliance thereon. *Husky Int'l Elecs., Inc. v. Ritz*, 136 S.Ct. 1581, 1586, 1589–90 (2016); *In re Rossman*, No. 17-51160, 2019 WL 3330781, at *6 (Bankr. D. Conn. July 24, 2019). The Court reasoned that "'[a]ctual fraud' has two parts: actual and fraud." *Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1586. According to the Court, "[t]he word 'actual' . . . denotes any fraud that 'involves moral turpitude or intentional wrong'" and "'fraud' connotes deception or trickery generally." *Id.* (quoting *Neal v. Clark*, 95 U.S. 704, 709 (1878) (internal alterations omitted). As a result, the Court determined that "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'" *Id.* While it declined to "adopt a definition for all times and all circumstances," the Court reasoned that "courts and legislatures have used the term 'fraud' to describe a debtor's transfer of assets that . . .

impairs a creditor's ability to collect the debt." *Id.* at 1587. With respect to "fraudulent conveyances," the Court reasoned that such fraud is "not an inducement-based fraud. . . . [and] typically involve[s] 'a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration.'" *Id.* (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 540–41 (1994)).

In light of the *Husky* decision and in the absence of a misrepresentation,[4] courts evaluate whether a debtor possessed "wrongful intent" while committing a "fraud" by employing "deception or trickery" in "transfer[ring] [] assets" to "impair[] a creditor's ability to collect the debt." *Husky Int'l Elecs., Inc.*, 136 S.Ct. at 1586–87; *see In re Thompson*, 555 B.R. 1, 10–11 (B.A.P. 10th Cir. 2016); *see also In re Christodoulakis*, No. 16-73610-AST, 2019 WL 360064, at *9 (Bankr. E.D.N.Y. Jan. 25, 2019). Actual fraud "can be shown by the presence of multiple 'badges of fraud,'" which include:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*In re Christodoulakis*, 2019 WL 360064, at *9 (citing *McCord v. Ally Financial, Inc.* (*In re USA United Fleet, Inc.*), 559 B.R. 41, 57 (Bankr. E.D.N.Y. 2016)).

---

[4] Here, there was in fact a misrepresentation. *See infra* "False Pretenses" section.

A. *The Debtor's Fraudulent Transfer Scheme*

The Court finds that Suparo established five "badges of fraud" and that the Debtor's

conduct is indicative of a fraudulent transfer scheme constituting "actual fraud" under *Husky*.

Specifically, despite the Personal Guarantee and as evidenced by Belsun's "General Ledger" (the

"Belsun Ledger") and Brookside's "General Ledger" (the "Brookside Ledger" (together with the

Belsun Ledger, the "Ledgers")), the Debtor effectuated transfers (1) that were made without

consideration; (2) to family, friends, and entities either owned by or associated with the Debtor

and his friends; (3) as a part of a pattern of transfers; (4) that were suspiciously timed; and (5)

left the Debtor and Belsun with insufficient assets and sources of income to pay the Personal

Guarantee.

i.    Personal Guarantee

The Personal Guarantee is unambiguous and provides for the "<u>punctual and full payment</u>

to Suparo of all payments due to Suparo, and the performance of all of Lavie's obligations, under

th[e] Agreement." Pl.'s Ex. 2, § 5(b) (emphasis in original). The Personal Guarantee further

provides that it "is a guarantee of payment and not of collection." *Id.* "[A] guarantor of payment

undertakes an unconditional guaranty that the debtor will pay on the debt," which means that the

creditor "can proceed directly against the guarantor" without taking preliminary collection

efforts "against the principal debtor . . . ." *New York City Dep't of Fin. v. Twin Rivers, Inc.*, 920

F. Supp. 50, 53 (S.D.N.Y. 1996). Thus, the Personal Guarantee was straightforward in that both

the Debtor and Belsun were responsible for Lavie's payment obligations under the Agreement.

The Debtor testified that he was aware of both his and Belsun's guarantees, he was responsible

for Belsun's finances, Belsun made no efforts to pay on the guarantee, and Belsun had

approximately $5,000,000 in revenue in 2012. Trial Tr. vol. 1, 98:21–25, 99:1–3, 20–25, 100:1–

9. Despite this, as seen in the Ledgers and as further discussed below, the Debtor caused numerous transfers to be made to family, friends, and related entities (collectively, the "Transferees") for no consideration, in a manner indicative of the Debtor possessing "wrongful intent" while employing "deception or trickery" to impair Suparo's ability to collects its debt.

ii.    <u>The Belsun Ledger</u>

The Belsun Ledger shows multiple transfers to the Debtor's family, friends, and his other company Digital Systems for which no consideration was provided, satisfying two of the above-mentioned "badges of fraud." By way of example, the Debtor transferred $3,000.00 to Digital Systems—a company owned by the Debtor and for which he acted as President—on May 10, 2012. Pl.'s Ex. 27. Notably, the Debtor testified that Digital Systems had "no business, no transactions" and that the company "shut down [in] 2012" after operating for "[j]ust six [to] eight months." Trial Tr. vol. 1, 126:18–25, 127:1–10.

The Belsun Ledger also shows a transfer to Arjun S. Kedia ("Arjun"), the Debtor's nephew, in the amount of $5,750.00 occurring on May 10, 2012. Pl.'s Ex. 27. Trial Tr. vol. 1, 102:22–25, 103:1–3. The Debtor claims that this was a loan from Belsun to Arjun, but admits there was never a loan agreement. Trial Tr. vol. 1, 103:4–11. Transfers to Sabina Banu Ateeque ("Sabina") in the amounts of $2,500.00 and $2,000.00 on June 13, 2012 and July 18, 2012, respectively, also appear on the Belsun Ledger. Pl.'s Ex. 27. Sabina was the wife of one of Lavie's co-owners. Trial Tr. vol. 1, 100:19–22. The Belsun Ledger also shows a transfer to Ridhima Goyal ("Ridhima") in the amount of $800.00 on October 4, 2012. Pl.'s Ex. 27. Ridhima is "the daughter of Atul," was "a teenager" at the time, and had nothing to do with Belsun. Trial Tr. vol. 1, 101:9–15. The Debtor testified that this transfer to Ridhima was actually for Atul,

while conceding that Atul, too, had nothing to do with Belsun. Trial Tr. vol. 1, 101:16–25, 102:1–2.

In his testimony, the Debtor explained that any loan made by Belsun to the Debtor's "friends or relatives" that was not repaid by the end of the year would be "adjusted against [his] salary or [] compensation . . . [a]nd what would not be final would [] carry over to the next year . . . ." Trial Tr. vol. 1, 103:13–22. However, the Debtor failed to introduce any documentary evidence demonstrating that his salary from Belsun was in fact adjusted or that the purported loans were ever repaid. Additionally, the Debtor admits that Belsun's books have not been audited since 2011, that Belsun did not file tax returns for 2012 or any year afterwards, and that there is no way to verify that he actually reduced his compensation by amounts not repaid by the Transferees. Trial Tr. vol. 1, 104:21–25, 105:1–10. It is apparent, therefore, that these transfers, orchestrated by the Debtor, were made (1) to family, friends, and his other company and (2) for no consideration.

iii.   <u>The Brookside Ledger</u>

The Brookside Ledger shows transfers of much greater magnitude to the Transferees for no consideration. Although Brookside was not itself a guarantor of the Suparo debt, any transfer out of Brookside affected the Debtor's ability to pay the Personal Guarantee because it reduced the value of the company, of which the Debtor was the sole owner and from which he received his income. Trial Tr. vol. 1, 127:17–25, 128:1–9, 129:3–4.

Between July 26, 2013 and December 7, 2013, the Brookside Ledger shows that the Debtor caused various transfers to be made by Brookside to family and friends totaling $27,003.51, including seven transfers to each of Ridhima and Sabina and eighteen to Nakul Goyal ("Nakul"), Atul's son. Pl.'s Ex. 28; Trial Tr. vol. 1, 131:3–25. Neither Sabina, Ridhima,

14

nor Nakul had any business connection to Brookside or the Debtor's other entities. Trial Tr. vol. 1, 130:24–25, 131:1–23. The Debtor testified that these transfers were loans, but admitted that none of these transferees signed loan agreements. Trial Tr. vol. 1, 132:6–10. When asked if "[t]hey just came and asked you for money and you gave them money out of Brookside," the Debtor responded, "Yes." Trial Tr. vol. 1, 132–13–15.

Between January 17, 2014 and September 30, 2014, the Brookside Ledger shows that the Debtor transferred a total of $84,117.00 to Sabina, Ridhima, Nakul, and Horizon Condominiums ("Horizon"), Atul's landlord; $48,174.00 of which was transferred post-petition. Pl.'s Ex. 29; Trial. Tr. vol. 1, 133:3–25. The Debtor testified that these, too, were loans, but admitted that, like the other transfers, none of the recipients "ever sign[ed] [] loan agreement[s] with Brookside." Trial Tr. vol. 1, 135:5–9. Some of the transfers to Sabina were labeled as "professional fees," even though Sabina had no relationship whatsoever with Brookside. Pl.'s Ex. 29; Trial Tr. vol. 1, 130:24–25, 131:1–23. According to the Debtor, these transfers to Sabina were mislabeled. Trial Tr. vol. 3, 82:2–5. With respect to the transfers to Horizon, the Debtor testified that he was "[p]aying money, not lending." Trial Tr. vol. 1, 134:4–11. When asked for clarification, the Debtor testified, "I'm paying on [Atul's] behalf to Horizon. So I'm not lending money to Horizon." Trial Tr. vol. 1, 134:13–16.

Finally, the Brookside Ledger also shows that the Debtor made $7,000.00 of post-petition transfers to Sitaram Kedia ("Sitaram"), the Debtor's father, between June 5, 2014 and September 1, 2014. Pl.'s Ex. 29; Trial Tr. 145:1–11. The Debtor testified that these were loans. Trial Tr. vol. 1, 143:18–24, 144:15–25, 145:1–13. When asked why he "never told the Court about . . . these payments that you were making to your father," the Debtor responded, "Why would I need to?

. . . This was my salary." Trial Tr. vol. 1, 145:21–24. When Suparo's counsel sought

clarification, the Debtor gave the following testimony:

> Q: And so your position is that you can do whatever you like with this money,
> right, because it's your money?
> A: It's my salary, yes.
> Q: Yeah, and that's even though you've made guarantees to creditors, right?
> A: Yes.

Trial Tr. vol. 1, 146:11–16.

The Debtor's repeated explanation under oath that all of these transfers were loans that

were repaid is not credible. Trial Tr. 148:22–24; 157:7–10. In fact, the method by which the

Debtor claims to have been repaid is entirely inconceivable. At his deposition, the Debtor gave

the following testimony, which was read into the record at trial:

> Q: So all of your loans were paid back?
> A: Correct.
> Q: How were the loans paid back?
> A: They were paid back to me from whomever I gave loans to.
> Q: Okay. But you don't have a bank account, so how were they paid to you.
> A: So I made them pay my wife or somebody else.
> Q: Do you have any documentation that any of this happened?
> A: No.
> Q: Because it never happened, right?
> A: Some of them happened.
> Q: But you have no documentation that you ever received any of this money
> back?
> A: No.
> Q: Even though they paid you back into your wife's account?
> A: Cash. Most of them in cash.
> Q: Oh, I see. They just gave you wads of money?
> A: Yes.

Pl.'s Ex. 20, at 197:15–25, 198:1–13. Trial Tr. vol. 1, 158:1–25, 159:1–4. When asked again at

trial if that was how he was paid back, the Debtor responded, "Some of it." Trial Tr. vol. 1,

159:3–4.

The Debtor also submitted his own Exhibit A, admittedly prepared by Lavie's bookkeeper for use in connection with the trial, ("Exhibit A"), which, according to the Debtor's testimony, "simplifie[s]" Brookside's transactions between 2013 and 2015 and contains "corrections and simplifications." Trial Tr. vol. 2, 64:16–25, 65:1; Pl.'s Ex. A. Exhibit A was intended to show monies going out to the Transferees, and corresponding monies coming in to Brookside. Def.'s Ex. A. The exhibit was not, however, "audited by an accountant . . . ." and contains numerous errors. Trial Tr. vol. 2, 74:2–11, 81:14–25, 82:1–25, 83:1–14. The bookkeeper, for example, deleted certain transfers, which the Debtor testified were "written off." Trial Tr. vol. 2, 80:18–25, 81:1–4. Further, the transfers to Sabina that were mislabeled as "professional fees" were inexplicably excluded from Exhibit A. Trial Tr. vol. 2, 82:2–14. Exhibit A also lists several "deposits" used to offset payments that were not supported by the evidence. Def.'s Ex. A. Appearing on Exhibit A are over $103,000.00 in credits for payments made by Vipul Overseas and NPT Paper. Def.'s Ex. A. The Debtor testified that those credits would appear on Brookside's bank statements, but they did not. Trial Tr. vol. 3, 9:5–25, 10:1–17, 18:3–24.

The Court finds neither Exhibit A nor the Debtor's other attempts to explain the transfers to be credible. To the contrary, the weight of the evidence demonstrates that numerous transfers appearing on the Brookside Ledger were made (1) to family, friends, and other companies and (2) for no consideration, further establishing the existence of two "badges of fraud" as articulated by the *Husky* court.

### B. Additional Badges of Fraud

Three additional "badges of fraud" are also implicated by the Debtor's behavior, including (1) a pattern or series of transactions; (2) a suspicious general chronology of

transactions; and (3) a change in the financial conditions of both the Debtor and Belsun. First, as evidenced by the Ledgers, the above-described series of transfers illustrate a pattern of conduct whereby the Debtor continually ignored his and Belsun's obligations pursuant to the Personal Guarantee by transferring monies for no consideration to parties with no connections to Lavie. The Debtor continued to do so even after (a) Lavie failed to perform under the Agreement; (b) the HSBC and Wells Fargo Checks bounced; and (c) the Debtor commenced this bankruptcy case. Thus, the weight of the evidence indicates that the Debtor engaged in an unmistakable pattern of conduct that disregarded the Personal Guarantee and left Suparo without payment.

Second, the general chronology of the transfers, when viewed in light of the financial difficulties besetting Lavie, indicates that the Debtor was attempting to impair Suparo's ability to collect on its debt pursuant to the Personal Guarantee. Specifically, the Debtor, through his companies, caused transfers to be made for no consideration to the Debtor's family, friends, and other company almost immediately after entry into the Agreement. When Lavie failed to make payments to Suparo, Nagpal applied "a lot of pressure" and the Debtor caused Lavie to issue the HSBC Checks to it. Trial Tr. vol. 1, 20:14–20. Despite the issuance of the HSBC Checks, the Debtor repeatedly advised Suparo to delay depositing them, insisting that the money would be there "next week," while, at the same time, effectuating transfers for no consideration. Trial Tr. vol. 1, 56: 13–20. These transfers to family, friends and other entities continued even after the HSBC Checks bounced and the Debtor instructed Suparo not to deposit the subsequently-issued Wells Fargo Checks.  Moreover, the Debtor unabashedly caused similar transfers to be made from Brookside for no consideration even _after_ commencing his bankruptcy case. The timing and manner of these transfers indicates that they were designed to deprive Suparo of its ability to

collect its debt by putting otherwise available funds out of its reach through a scheme of numerous fraudulent conveyances.

Third, the financial conditions of both the Debtor and Belsun changed during the period in which the transfers were made. Despite having approximately $5,000,000 in revenue in 2012, Belsun ceased operations by the end of 2013. Trial Tr. vol. 1, 100:6–9, 152:19–20. According to his Statement of Financial Affairs, the Debtor's income decreased from $94,816.00 in 2012 to $19,000 in 2013. Pl.'s Ex. 13. The Debtor filed for bankruptcy on April 14, 2014. Pl.'s Ex. 13. Thus, the Debtor's financial condition and that of his companies severely deteriorated during the time period when large sums were given to the Transferees and repeated promises of payment were made and broken to Suparo.

In light of the above, the Court finds that Suparo established the existence of five "badges of fraud" by a preponderance of the evidence and that the Debtor engaged in a fraudulent transfer scheme. The weight of the evidence can lead to no other conclusion than the Debtor wrongfully and intentionally caused transfers to be made from Belsun and Brookside to his family, friends, and companies owned by the Debtor or associated with his friends, while disregarding his and Belsun's obligations under the Personal Guarantee, so as to deprive Suparo of any ability to collect the debt owed it. This conduct is precisely the type of "deception or trickery" contemplated in *Husky. See Husky Int'l Elecs.*, 136 S.Ct. at 1586–87. Upon the foregoing, the Court finds that the Debtor engaged in "actual fraud" pursuant to § 523(a)(2)(A).

### *False Pretenses*

Section 523(a)(2)(A) also provides that a debt for money or property obtained by "false pretenses" is nondischargeable.  As used in § 523(a)(2)(A), the term "false pretenses" is defined as "conscious[,] deceptive or misleading conduct calculated to obtain, or deprive, another of

property" and encompasses any "scam, scheme, subterfuge, artifice, deceit, or chicanery in the accomplishment of an unlawful objective on behalf of the defendant." *In re Hambley*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005) (quoting *In re Kovler*, 249 B.R. 238, 261 (Bankr. S.D.N.Y. 2000)) (internal quotations omitted). "A false pretense has also been held to be an implied misrepresentation or conduct intended to create a false impression." *In re Chase*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (citing *In re Hambley*, 329 B.R. at 382). False pretenses are "promoted willingly and knowingly by a defendant and is not the result of unintentional conduct or an unintentional misrepresentation." *In re Hambley*, 329 B.R. at 396 (citing *In re Kovler*, 249 B.R. at 261). The "[f]ailure to disclose material facts on which a transaction depends constitutes false pretenses within the statute." *Id.* (citing *In re Soliz*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996)).

To prove that a debt is non-dischargeable as a debt for money obtained by false pretenses, a plaintiff must establish: "(1) an implied misrepresentation or conduct by the defendant[]; (2) promoted knowingly and willingly by the defendant[]; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff[]; (4) which wrongfully induced the plaintiff[] to advance money, property, or credit to the defendant." *In re Wisell*, 494 B.R. 23, 36 (Bankr. E.D.N.Y. 2011) (quoting *In re Hambley*, 329 B.R. at 396).

Suparo alleges that the Debtor "caused Suparo to believe that the goods Suparo were to order and pay for were pre-sold, [] that Suparo would be paid directly from those proceeds," and that the Debtor "knew that Suparo was relying on" that representation, and that Suparo in fact justifiably relied. Pl.'s Posttrial Mem. 24–26. Nagpal testified that the Debtor "assured [him] that the goods which came in were presold, they were already supplied, and the receivables were due from many, many customers." Trial Tr. vol. 1, 28:1–6. According to Nagpal, the Debtor initially

represented to him that the goods were pre-sold when he first sought "financing [for] Lavie" and continued to make this representation afterwards. Trial Tr. vol. 1, 28:1–17. Nagpal further testified that he "understood [the Debtor's representations] to [mean] that Lavie already had the orders in hand for the goods which they were placing orders with [Suparo] and further with the vendors." Trial Tr. vol. 1, 28:10–14. Nagpal stated that the Debtor repeatedly "showed [him] that the payments would be made and the receivables were there and the goods had already been sold." Trial Tr. vol. 1, 28:2–9. Suparo contends that these were "bogus or misleading orders." Pl.'s Posttrial Mem. 3.

During the Debtor's testimony, he repeatedly admitted to having impliedly represented that the goods were pre-sold. Trial Tr. vol. 1, 66:24–25, 67:1–12; Trial Tr. vol. 2, 39:4–7; Trial Tr. vol. 3, 34:18–21. When asked whether he had "told [Nagpal] that the goods he was to order were presold," the Debtor testified, "I implied that, yes." Trial Tr. vol. 1, 66:24–25, 67:1–2. Additionally, when asked by his own counsel whether the Agreement provided that the goods "had already been sold," the Debtor responded, "I have implied that . . . ." Trial Tr. vol. 3, 34:18–21.

The Debtor's testimony confirms Suparo's contention that the Debtor intentionally represented that the goods were pre-sold. Specifically, when asked by the Court whether he "intend[ed] to leave the impression that the goods were pre-sold," the Debtor responded, "Yes." Trial Tr. vol. 2. 39:4–7. Further, there was no evidence introduced by the Debtor at trial contradicting that this was—and was intended to be—a false pretense. The record is also devoid of any documentary evidence indicating that the goods were in fact pre-sold as the Debtor represented.

The Debtor advances two defenses, both of which are unavailing. First, the Debtor argues that the merger clause in the Agreement prevents the Court from considering any "alleged representation[] made prior to the Agreement . . . whether or not false or made with intent to deceive." Def.'s Posttrial Mem. 25; Pl.'s Ex. 2, § 6(c). This is a blatant misstatement of New York law, which governs the Agreement. Pl.'s Ex. 2, § 6(b). Under New York law, a "merger clause is ineffective [] to preclude parol evidence that a party was induced to enter [into a] contract by means of fraud." *Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993); *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006).

Second, the Debtor argues that Suparo has "presented no evidence that [it] justifiably relied on any alleged false representation made by the Debtor . . . ." Def.'s Posttrial Mem. 25. According to the Supreme Court, "§ 523(a)(2)(A) requires justifiable, but not reasonable, reliance." *Field v. Mans*, 516 U.S. 59, 74–75 (1995). This standard is "an intermediate level of reliance; less than reasonable but more than mere reliance in fact." *In re Wong*, 291 B.R. 266, 275 (Bankr. S.D.N.Y. 2003). This means that "a creditor can[not] bury its head in the sand like an ostrich and ignore facts that are readily available to it." *Id.* at 276 (quoting *In re Bogstad*, 779 F.2d 370, 373 (7th Cir. 1985)). As discussed above, Nagpal testified that the Debtor showed him orders indicating that the goods were presold and that receivables were due to Lavie. Trial Tr. vol. 1, 28:1–9. Suparo contends that it did not know that these were "bogus customer lists and orders received," and that Suparo relied upon their existence. Pl.'s Posttrial Mem. 1, 24–26. The Debtor did not present any evidence contravening Suparo's contentions. However, as Nagpal testified, the fact that Lavie had fully repaid Suparo $60,000 pursuant to a prior loan agreement, "made [Nagpal] believe everything that [the Debtor] was telling" him, further indicating justification for reliance. Trial Tr. vol. 1, 58:16–19. Suparo did not just simply rely on the

22

Debtor's misrepresentation, it relied upon documentation presented at a time when it had confidence that the Debtor was being honest and above board. As a result, the Court concludes Suparo justifiably relied upon the Debtor's misrepresentations and the Debtor's second purported defense also fails.

For the reasons set forth above, the Court finds that Suparo has demonstrated by a preponderance of the evidence that the Debtor caused it to advance financing to Lavie with respect to the Agreement under "false pretenses" pursuant to § 523(a)(2)(A).

## CONCLUSION

Based on the foregoing, Suparo has proven that the debt owed it should be excepted from the Debtor's discharge on two independent and alternative bases—"actual fraud" and "false pretenses"—pursuant to § 523(a)(2)(A) of the Bankruptcy Code. Having made this determination, the Court need not consider Suparo's other arguments pursuant to § 523(a)(2)(A) and (a)(6). Suparo is directed to settle a Judgment and Order of Non-Dischargeability consistent with this decision.

**IT IS SO ORDERED.**

**Dated: October 3, 2019**
       **Brooklyn, New York**

                                                      **Nancy Hershey Lord**
                                         **United States Bankruptcy Judge**